IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| EXIDE TECHNOLOGIES, et al.,[1] | ) | Case No. 02-11125 (___) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |

## MOTION FOR AN ORDER AUTHORIZING THE DEBTORS TO IMPLEMENT A KEY EMPLOYEE RESTRUCTURING MILESTONE INCENTIVE AND INCOME PROTECTION PROGRAM

Exide Technologies and certain of its domestic subsidiaries, as debtors and debtors in possession (collectively, the "Debtors") in the above captioned cases, hereby move the Court for entry of an Order Authorizing the Debtors to maintain a Key Employee Restructuring Milestone Incentive and Income Protection Program (the "Motion"). In support of this Motion, the Debtors respectfully state as follows.[2]

### Jurisdiction

1.      This Court has jurisdiction over this Motion under 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A), (M) and (O).

2.      Venue of these proceedings and this Motion is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[1]  The Debtors in these proceedings are: Exide Technologies f/k/a Exide Corporation; Exide Delaware, L.L.C.; Exide Illinois, Inc. and RBD Liquidation, L.L.C.

[2]  The facts and circumstances supporting this Motion are set forth in the Affidavit of Lisa Donahue, Chief Financial Officer and Chief Restructuring Officer of Exide Technologies, in Support of First Day Motions, filed contemporaneously herewith, (hereinafter, the "Donahue Affidavit").

3.     The statutory predicates for the relief requested herein are sections 105(a), 363 and 365 of title 11 of the United States Code (the "Bankruptcy Code").

4.     As there are no novel issues of law presented herein, the Debtors waive their right to file a brief in support of the Motion pursuant to D. DEL. LR 7.1.2(A), incorporated by reference into the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware by DEL. BANKR. LR 1001-(B). Because of the nature of the relief requested in this Motion, the Debtors assert that no briefing is required.

### Background

5.     On April 15, 2002 (the "Petition Date"), each of the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases"). The Debtors continue in possession of their properties and are operating and managing their businesses as debtors and debtors in possession pursuant to Bankruptcy Code §§ 1107(a) and 1108.

6.     No request has been made for the appointment of a trustee or examiner, and no official committee of creditors has been established in these cases.

### Description of the Debtors

7.     The Debtors and their non-debtor subsidiaries and affiliates[3] (collectively, "Exide") are the world-wide leading manufacturer and distributor of lead acid batteries and other related electrical energy storage products. Exide manufactures and distributes industrial and transportation batteries in North America, Europe, Asia, the Middle East, India, Australia, and

---

[3]     Debtor Exide Technologies has European, Asian, Australian and New Zealand subsidiaries that are non-debtors and that conduct their operations throughout the world. None of Exide's direct or indirect foreign subsidiaries are debtors in the Chapter 11 Cases or in any related bankruptcy, reorganization, or liquidation proceeding.

New Zealand. As a result of recent acquisitions discussed below, Exide Technologies (formerly known as Exide Corporation) is the largest lead battery manufacturer in the world.

8.     Exide's industrial batteries consist of motive power batteries, such as those for use in fork-lift trucks and other electrical vehicles, and network power batteries used for back-up power applications primarily for telecommunications and computer data centers. Exide distributes and markets its transportation batteries to a broad range of retailers, distributors of replacement or after-market batteries, and automotive original equipment manufacturers.

9.     The Debtors have nineteen (19) manufacturing facilities in the United States and employ approximately 6,500 persons as of the Petition Date.

10.     As of March 31, 2001, the Debtors, together with their non-debtor subsidiaries and affiliates, had consolidated assets with a net-book value of $2.1 billion and consolidated liabilities with a net-book value of $2.5 billion. Exide's net sales for fiscal year ending March 31, 2001, were approximately $2.4 billion and are projected to be $2.5 billion for fiscal year ending March 31, 2002.

## Corporate History and Structure of the Debtors

11.     A chart setting forth the Debtors' corporate structure is annexed as Exhibit "A" to the Affidavit of Lisa Donahue, Chief Financial Officer and Chief Restructuring Officer of Exide Technologies, in Support of First Day Motions (the "Donahue Affidavit").

12.     Debtor Exide Technologies is a Delaware corporation organized in 1966 and is a successor in interest to a New Jersey corporation originally founded in 1888. Exide's principal executive offices are located in Princeton, New Jersey. On August 10, 2001, Exide

Technologies changed its name from Exide Corporation. Exide Technologies is the parent corporation of seven (7) direct North American subsidiaries three of which are also Chapter 11 debtors. Exide Technologies' common stock was historically traded on the New York Stock Exchange until February 15, 2002, when it was delisted. At present, the stock is now trading on the OTC Bulletin Board under the symbol "EXDT."

13. Three of the Debtors have little or no operations: (a) Exide Illinois, Inc., (b) Exide Delaware, L.L.C. and (c) RBD Liquidation, L.L.C.

14. On April 9, 2002, Exide Technologies and RBD Liquidation, L.L.C. f/k/a Royal Battery Distributors, L.L.C. ("RBD") completed the sale of all RBD's assets to an unrelated third party for $1,670,117.00 in cash paid at closing. In connection with the closing of the transaction, RBD filed a certificate of amendment with the Delaware Secretary of State changing its name to RBD Liquidation, L.L.C.

### Description of Debtors' Indebtedness

15. As of March 31, 2001, the Debtors owed approximately $1,345 million to creditors including but not limited to: (a) not less than $430.4 million of secured debt owed to certain pre-petition lenders (excluding issued and undrawn letters of credit and the obligations of the non-debtor foreign subsidiaries of Exide in respect of which Exide and certain of its Debtor subsidiaries have issued secured guarantees), (b) $149 million of ordinary course trade payables, (c) $178 million under capitalized and operating leases, and (d) approximately $620 million of general unsecured debt excluding the amount described in clause (b) above which includes (i)

$300 million of Senior Notes issued by Exide Technologies and (ii) approximately $318 million (accreted value) of 2.9% Convertible Senior Subordinated Notes issued by Exide Technologies.

## A. The Secured Bank Debt

16.     On December 19, 1997, Exide entered into a Credit and Guarantee Agreement with a group of banks including Credit Suisse First Boston as administrative agent (collectively, the "Pre-Petition Lenders"). On September 29, 2000, the Credit and Guarantee Agreement was amended for the primary purpose of providing additional financing for the purchase price to be paid by Exide in connection with the acquisition of GNB. The Credit and Guarantee Agreement was subsequently amended from time to time (together, the Credit and Guarantee Agreement and all amendments are referred to as the "Pre-Petition Credit Agreement").

17.     The Pre-Petition Credit Agreement has three borrowing tranches: (a) a $150 million Term A loan; (b) a $500 million Term B loan; and (c) a $250 million revolving credit facility (the "Revolving Facility"). The Revolving Facility includes a sub-facility for the issuance of up to $50 million of letters of credit. Debtor Exide Technologies is a borrower under the Pre-Petition Credit Agreement. Certain foreign, non-debtor subsidiaries of Exide are also borrowers under the Pre-Petition Credit Agreement. In addition, Debtor Exide Technologies and its subsidiaries, Debtors Exide Delaware, L.L.C. and RBD Liquidation, L.L.C. (together the "Domestic Debtor Subsidiaries") and non-debtor GNB Battery Technologies Japan, L.L.C. (together with the Domestic Debtor Subsidiaries, the "Domestic Subsidiary Guarantors") have guaranteed, subject in the case of the Domestic Subsidiary Guarantors to certain limitations set

forth in Section 10.1 of the Pre-Petition Credit Agreement, all of the borrowings and other obligations of certain foreign, non-debtor subsidiaries of Exide Technologies which are also borrowers under the Pre-Petition Credit Agreement. The Domestic Subsidiary Guarantors have also guaranteed, subject to certain limitations set forth in Section 10.1 of the Pre-Petition Credit Agreement, all of the borrowings and other obligations of Debtor Exide Technologies under the Pre-Petition Credit Agreement.

18.     The indebtedness under the Pre-Petition Credit Agreement and all related obligations (the "Pre-Petition Bank Obligations") are secured by: (i) substantially all the assets of Exide Technologies and the Domestic Subsidiary Guarantors; (ii) limited assets of certain foreign subsidiaries; and (iii) pledged stock of certain foreign subsidiaries of Exide Technologies. As of the Petition Date, the outstanding aggregate principal amount of the Pre-Petition Bank Obligations was not less than approximately $692.6 million and issued and undrawn letters of credit having an aggregate maximum exposure of approximately $31.95 million.

19.     The Pre-Petition Credit Agreement contains certain financial covenants. Exide has obtained waivers from the Pre-Petition Lenders with respect to non-compliance with certain of these covenants as described more fully below.

**B.      The Unsecured Bond Debt**

20.     The Debtors' general unsecured debt includes (a) $300 million of 10% Senior Notes issued by Exide Technologies in April 1995 (the "Senior Notes") and (b) 2.9%

Convertible Senior Subordinated Notes issued by Exide Technologies with an original face amount of approximately $397 million issued in December 1995 (the "Subordinated Notes").

21.     The Senior Notes have an aggregate outstanding principal amount equal to $300 million. Interest on the Senior Notes is payable in cash on April 15 and October 15 of each year. The Senior Notes are unsecured senior obligations of Exide Technologies and are not guaranteed by any domestic or foreign subsidiaries.

22.     As of December 31, 2001, the Subordinated Notes have an aggregate, accreted, outstanding amount equal to $318 million. Cash interest on the Subordinated Notes is payable on June 15 and December 15 of each year. The Subordinated Notes are subordinated obligations of Exide Technologies and are not guaranteed by any domestic or foreign subsidiaries, and rank junior to the Pre-Petition Bank Obligations and the Senior Notes and are senior to, or *pari passu* with, all other indebtedness of the Debtors.

23.     In 2001, the Debtors began preliminary discussions concerning the status of the company with an ad hoc committee of certain large holders of the Senior and Subordinated Notes (the "Informal Committee of Noteholders"). The Informal Committee of Noteholders has retained counsel and financial advisers and Exide has been cooperating with due diligence requests from this constituency.

C.      The U.S. Securitization

24.     In addition to its secured credit and unsecured debt facilities, the Debtors also participate in a securitization facility with respect to its domestic receivables (the "U.S.

Securitization Facility").[4] Under this facility, Exide sells certain receivables on a continuous basis to Exide U.S. Funding Corportion, a non-debtor affiliate. Exide U.S. Funding resells such receivables to a third-party. The maximum amount that may be outstanding under the U.S. Securitization Facility at any point in time is $200 million.

25. In the month preceding the Petition Date, because the Debtors are fully drawn on their other credit facilities, the U.S. Securitization Facility has been the only material source of liquidity for the Debtors' operations.

### Factors Leading to the Commencement of the Debtors' Chapter 11 Cases

26. Lead acid batteries are manufactured, distributed and marketed in a highly competitive environment. Beginning in mid-2001, the Debtors experienced increased competitive pressures and a downturn in general economic conditions, shrinking sales in the battery manufacturing industry, and raw material price increases. These factors, combined with an overhead structure that was not adjusted to reflect declining trends, created downward pressure on earnings.

27. As a result, during the fourth calendar quarter of 2001, the Debtors determined that they would not be able to comply with certain financial covenants in the Pre-Petition Credit Agreement. To address these problems, the Debtor Exide negotiated with the Pre-Petition Secured Lenders the Third Amendment and Waiver to the Pre-Petition Credit Agreement and other loan documents dated December 28, 2001. In the Third Amendment, the

---

[4] Exide has also established a separate $175 million securitization facility for its foreign subsidiaries.

Pre-Petition Secured Lenders waived Exide's compliance with certain covenants and any defaults resulting from such non-compliance through April 12, 2002.

28.    During March of 2002, the Debtors determined that they would not be able to make the payments of principal and interest due on March 28 and April 4, 2002 respectively. To address these problems, the Debtors negotiated with the Pre-Petition Lenders the Fourth Amendment and Waiver to the Pre-Petition Credit Agreement dated March 28, 2002. In the Fourth Amendment, the Pre-Petition Lenders extended the due date for such payments to April 15, 2002. The Pre-Petition Lenders' waiver of Debtors' compliance with certain covenants and any defaults resulting from such non-compliance was extended through April 15, 2002.

29.    Moreover, an approximately $15 million interest payment on the Senior Notes was due on April 15, 2002. Notwithstanding the Debtors' efforts to improve liquidity, the Debtors did not have sufficient funds to make this interest payment. The Debtors' default on the Senior Notes would result in cross-default in the U.S. Securitization Facility, effectively eliminating the Debtors' last source of cash to operate.

30.    After consideration of all reasonably available alternatives, and in light of the Debtors' liquidity crisis, the Debtors determined that the voluntary commencement of these Chapter 11 Cases would provide them with sufficient breathing space to enable them to restructure their financial affairs and reorganize their businesses for the benefit of all their creditors.

## Relief Requested

31.    The Debtors seek an order authorizing and approving a key employee restructuring milestone incentive and income protection program (the "Program") designed to stabilize the Debtors' key management force and to accomplish and promote the successful reorganization of the Debtors (the "Reorganization"). To that end, the Debtors seek Court approval of the Program.

## Overview of the Program

32.    The Debtors' management, with the assistance of William M. Mercer, Inc., the Debtors' compensation and retention advisor, developed the Program to assist the Debtors in retaining the services of their key employees and to protect their investment in human capital during the Reorganization. The Program addresses the Debtors' anticipated personnel needs during the Reorganization, addresses the actions needed to implement the restructuring and reorganization plan, addresses the Debtors' employment relationship with approximately eighty (80) current employees and provides a discretionary reserve fund for use in retaining the services of other current employees deemed critical to the performance of the Debtors' businesses during the Debtors' Chapter 11 Cases (the "Key Employees").

33.    The Key Employees are particularly important to the success of the Reorganization due to the complex and varying aspects of the Debtors' businesses. The Key Employees are intimately familiar with the Debtors' businesses and have the experience and knowledge necessary to manage and coordinate the Debtors' intricate operations and logistics through the completion of the Reorganization and implement the changes needed to successfully

complete the restructuring and Reorganization. The importance of the Key Employees to the Debtors is heightened by the lack of depth among the Debtors' management ranks as a result of extensive downsizing previously undertaken by the Debtors, voluntary attrition before the filing by Key Employees, and additional workforce reductions that will take place as part of the restructuring and Reorganization.

34. Replacements for the Key Employees are not easily found due in part to the Debtors' position as the largest manufacturer of stored power systems in the United States and the Debtors' current financial status. Further, replacements for the Key Employees would require many years of training to master the complexities of the Debtors' businesses both in technical and commercial terms. Therefore, the Debtors believe that it is in the best interests of their creditors and estates that the following Key Employees be covered by the Program: (a) the President and Chief Executive Officer, (b) Direct Reports to the President and Chief Executive Officer[5], (c) Vice Presidents, (d) Directors and Plant Managers, (e) corporate managers and professionals and other current employees deemed as vital to the Reorganization.

35. In addition, the financial expectations of Key Employees have been frustrated as the stock options previously granted to Key Employees over the past three (3) years have no value as a consequence of the deteriorating economy and the precipitous drop in the price of the common stock of Exide Technologies. As a result, there has been a substantial reduction in the total compensation opportunity for Key Employees. That condition is further aggravated by the loss of income because Exide does not expect to pay annual bonuses to Key

---

[5] This includes the presidents of the Debtors' three global business units, their general counsel, and their senior vice-president for manufacturing and engineering.

Employees for Fiscal Year 2002. As a result, recently Key Employees have not received competitive levels of total compensation. The proposed Program is a key element in addressing the potentially serious problem of retaining Key Employees and assuring that the Debtor's compensation levels are competitive with other potential employers.

36.     The Debtors' senior management has identified the following important objectives of the Program:

- Retain management and professional teams essential to driving the implementation of the restructuring and Reorganization process;

- Retain management and professional teams essential to the continuing operations of the business; and

- Continue its income protection program (and extend its benefits for certain employees) to create a stronger sense of security through the Chapter 11 Cases.

37.     The Program consists of three components: (a) the restructuring milestone incentive plan (the "Incentive Plan"), (b) a discretionary reserve fund (the "Reserve Fund") and (c) the income protection plan (the "Income Protection Plan"). Each component is designed to assist the Debtors in motivating the Key Employees to execute the restructuring plan and retaining the services of their Key Employees by providing competitive financial incentives and protecting the Debtors' investment in human capital during the Reorganization.

38.     Although the details of the Program are still being developed, the Debtors currently estimate that the total cost of the Incentive Plan and Reserve Fund components of the Program will be approximately $5.616 million. Of that $5.616 million, approximately $940,000 has already been paid under the Incentive Plan and approximately $113,000 has already been paid from the Reserve Fund. As such, the Debtors estimate that the Incentive Plan and Reserve

Fund combined will cost approximately $4.563 million during the pendency of these Chapter 11 Cases.

39.     It is impossible to predict the cost of the Income Protection Plan currently offered to salaried employees since the Debtors do not currently estimate reductions in workforce. As to the certain employees whose benefits under the Income Protection Plan are proposed to be extended, the maximum theoretical cost of such incremental benefits is no greater than $2.505 million. The Debtors currently estimate that the Income Protection Plan component of the Program will be no greater than $2.505 million. As such, the Debtors estimate that the total cost of the Program during the pendency of these Chapter 11 Cases will be no greater than $7.068 million.

### The Restructuring Milestone Incentive Plan

40.     The Incentive Plan provides incentives to Key Employees to remain with the Debtors throughout the Reorganization and to implement the changes needed to successfully complete the Reorganization. Under the Incentive Plan, participants can earn an additional bonus equal to 10 - 100 % of their annual base pay. Approximately $940,000 has already been paid under the Incentive Plan. The following chart shows the tiers and bonus eligibility:

| Tier | Participating Employee (Number of Participants) | Incentive Payment (Annualized Percentage of Base Salary) |
|------|--------------------------------------------------|----------------------------------------------------------|
| I | Chief Executive Officer (1) | 100% |
| II | Direct Reports to CEO (5) | 80% |
| III | Vice Presidents (19) | 20% - 35% |
| IV | Directors/Plant Managers (44) | 15% - 30% |
| V | Managers/Other Key Employees (11) | 10% - 20% |

41.     Each Program participant received 25% of their Incentive Plan bonus after completing the Debtors' Five (5) Year Business Plan. This was one of the key steps to developing a restructuring process and was completed and paid on March 1, 2002.

42.     Each participant will receive the second 25% of their Incentive Plan bonus if and only if they meet certain operational and restructuring commitments that have been assigned to each participant. The commitments are based upon operational activities designated in the Debtors' five (5) year business plan that are to be completed on or before December 2002. Assuming successful attainment of the goals set for the Key Employees, the Debtor anticipates a payment effective date on or before December 2002.

43.     The final 50% of their Incentive Plan bonus will be paid to eligible employees on the day the plan of reorganization is approved. However, the plan of reorganization must be approved on or before June 30, 2003 to qualify for the third phase of the payment. Thus, because a portion of a participant's payout is contingent upon continuing service through most—and hopefully all—of the Reorganization process, the participant will be motivated to stay with the Debtors and to assist in the Debtors' efforts during these Chapter 11 Cases. Employees who voluntarily terminate their employment prior to the Reorganization shall not be entitled to receive any remaining portion of their bonuses under the Program.

Additionally, money allocated to the Incentive Plan, but not used due to Key Employee attrition or other extenuating circumstances will be transferred to the Reserve Fund.

## The Reserve Fund

44.     A Reserve Fund will be available at the discretion of the Chief Executive Officer of the Debtors to be used to encourage retention of other employees whose actions benefit the restructuring. This fund is generally open to employees who are observed making substantial operating and restructuring contributions. Approximately $113,000 has already been used for payment of certain one-time discretionary bonuses paid for extenuating circumstances and extraordinary work efforts. A recommendation form must be submitted stating the amount that is recommended and the action that the manager witnessed as a rationale for distributing a one time bonus. All recommendations must be approved by the relevant Division President and must have approval of the Chief Executive Officer of the Debtors.

45.     The Debtors estimate that the cost of the Incentive Plan and Reserve Plan combined during the course of the Chapter 11 Cases will be approximately $4.563 million. Funds not used in conjunction with the Incentive Plan will be transferred to the Reserve Fund for use as an award for actions as previously described.

## The Income Protection Plan

46.     In the ordinary course of their businesses, the Debtors have in place an income protection program designed to retain employees and induce new employees to accept employment ("Income Protection"). The benefits of this plan are provided to salaried employees who are terminated from the Debtors employ for reasons other than cause, *i.e.,* position

elimination or reduction in staff. Income Protection is based on length of service, salary grade, and position within the management structure. Income Protection ceases when payments are provided for a specific period or the former salaried Employee obtains other employment with a salary equal to or greater than the Income Protection amount during the Income Protection (the "Income Protection Period"). Therefore, Income Protection accrues only if and when an employee is terminated without cause.

47.     Income Protection is made up of two components. First, the Debtors pay the former employee his or her entire salary until the earlier of the former employee obtaining new employment and the expiration of the Income Protection Period. If the former employee obtains new employment at a salary less than his or her salary with the Debtors, the Debtors will pay the difference between the former employee's salary with the Debtors and the former Employee's new salary for the Income Protection Period (the "Salary Component"). Second, the Debtors will provide the former employee with health benefits until the earlier of the former employee obtaining new employment that provides health insurance and the Income Protection Period (the "Health Insurance component").

48.     By this Motion, the Debtors seek the authority to continue Income Protection for all salaried Employees employed by the Debtors on the Petition Date. As of the Petition Date, no current salaried Employee is owed Income Protection. As for former employees, the Debtors do not intend to pay the Salary Component to former employees who may have been receiving income protection payments as of the Petition Date. The Debtors do, however, request authority to pay the Health Insurance Component to former employees that

remain unpaid as of the Petition Date and to continue the health Insurance Component for former employees until the earlier of the former employee obtaining new employment that offers health insurance or the former employee being able to obtain health insurance under existing policies (i.e., through a spouse or any other family member's insurance policy) and the Income Protection Period.

49.     Additionally, the Debtors propose that with respect to thirteen (13) of its Key Employees that the Income Protection Plan that presently applies to all of the Debtors' salaried employees, which is equal to one year of income protection, be extended to two years of income protection. If any such Key Employee is terminated for cause or leaves voluntarily, each such employee shall not be eligible to receive benefits under the Income Protection Plan. The Debtors anticipate that the aggregate amount of the incremental payments made by extending the income protection benefit from one (1) year to two (2) years will be no greater than $2.505 million.

### Basis for Relief of the Program

50.     The Debtors seek authority pursuant to section 363(b) of the Bankruptcy Code to implement the Program to provide incentives to the Key Employees to remain with the Debtors and to contribute to the Debtors' efforts during these Chapter 11 Cases. Section 363(b) provides, in relevant part, that "the trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." A court may authorize a debtor to use property of the estate pursuant to section 363(b)(1) of the Bankruptcy Code when such use is an exercise of the debtor's sound business judgment and when the use of the property

is proposed in good faith. See, e.g., In re Delaware & Hudson R.R. Co., 124 B.R. 169, 176 (D. Del. 1991) (explaining that the Third Circuit has adopted the "sound business purpose" test to evaluate motions brought pursuant to section 363(b)); see also Stephen Indus., Inc. v. McClung, 789 F.2d 386, 390 (6th Cir. 1986) (adopting the "sound business purpose" standard for sales proposed pursuant to section 363(b)); In re Abbotts Dairies of Pennsylvania, Inc., 788 F.2d 143 (3d Cir. 1986).

51.     The debtor has the burden to establish that a valid business purpose exists for the use of estate property in a manner that is not in the ordinary course of business. See In re Lionel Corp., 722 F.2d 1063, 1070-71 (2d Cir. 1983). Once the debtor has articulated a valid business purpose, however, a presumption arises that the debtor's decision was made on an informed basis, in good faith and in the honest belief the action was in the best interest of the company. See In re Integrated Resources, Inc., 147 B.R. at 656 (S.D.N.Y. 1992).

52.     Generally, courts authorize debtors to implement financial reward programs specifically designed to motivate the retention of key employees, because key employees are an essential component of a debtor's continued operation and successful reorganization. See In re America West Airlines, Inc., 171 B.R. 674, 678 (Bankr. D. Ariz. 1994) (approving success bonuses to certain officers and employees as within debtor's sound business judgment); In re Interco Inc., 128 B.R. 229, 234 (Bankr. E.D. Mo. 1991) (authorizing debtor to assume prepetition Income Protection contracts and approving performance based retention program to ensure critical employees remained with the debtor).

53. To maintain cohesive and motivated management teams during the reorganization process—particularly in large chapter 11 cases—debtors frequently implement various combinations of incentive compensation, retention and/or Income Protection programs. Without the implementation of such programs, essential key employees will leave a debtor's employ as a result of other employment opportunities offering greater financial rewards and fewer uncertainties inherent in chapter 11 cases such as these. Recognizing these risks, similar employment and incentive plans have been authorized recently by this as well as other courts, including In re Kmart Corporation, Case No. 02 B 02474 (Bankr. N.D. Ill. January 22, 2002); In re Comdisco, Inc., Case No. 01 B 24795 (Bankr. N.D. Ill. July 17, 2001); In re Humphreys, Inc., Case No. 01 B 13742 (Bankr. N.D. Ill. April 18, 2001); In re Trans World Airlines, Inc., Case No. 01-0056 (Bankr. D. Del. January 10, 2001).

54. In developing the Program, the Debtors and William M. Mercer, Inc. analyzed the need for and merits of the Debtors' proposed retention plan. Based upon this analysis, the Debtors believe that the Program is similar in design and scope to programs implemented by other similarly situated debtors.

55. In light of the foregoing, the Debtors believe that the incentives provided under the Program will enhance the prospects of retaining the Key Employees and, ultimately, aid the successful resolution of these Chapter 11 Cases. For all of the foregoing reasons, the Program should be approved.

## Notice

56. Notice of this Motion has been given to (a) the Office of the United States Trustee, (b) the counsel for the pre-petition lender, (c) the counsel for the post petition lender and (d) counsel for the Informal Committee of Noteholders. Following the initial hearing in these cases, notice of this Motion will be given to (i) the Debtors' forty largest unsecured creditors and (ii) those persons who have requested notice pursuant to Federal Rule of Bankruptcy Procedure 2002. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need to be given.

## No Prior Request

57. No prior motion for the relief requested herein has been made to this or any other Court.

WHEREFORE, the Debtors request the entry of an order, substantially in the form attached hereto authorizing the Debtors to implement the Program.

Dated: April 15, 2002

KIRKLAND & ELLIS
Matthew N. Kleiman
Kirk A. Kennedy
200 East Randolph Drive
Chicago, IL 60601
Telephone: (312) 861-2000
Facsimile: (312) 861-2200

-and-

PACHULSKI, STANG, ZIEHL, YOUNG & JONES P.C.

Laura Davis Jones (Bar No. 2436)
James E. O'Neill (Bar No 4042)
Christopher J. Lhulier (Bar No. 3850)
Kathleen Marshall DePhillips (Bar No. 4173)
16th Floor, 919 North Market Street
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400

[Proposed] Co-Counsel for the
Debtors and Debtors in Possession